UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| TIMOTHY MARCUS MAYBERRY, | |
| Plaintiff, | |
| v. | CAUSE NO. 3:23-cv-00911-SLC |
| STACY HALL, | |
| Defendant. | |

## OPINION AND ORDER

Plaintiff Timothy Marcus Mayberry, a prisoner without a lawyer, proceeds on a claim against Defendant Stacy Hall for interfering with his access to the courts by delaying her response to his law library requests at the Miami Correctional Facility, which prevented him from pursuing a tort claim against a librarian at the Wabash Valley Correctional Facility under the Indiana Tort Claims Act (ITCA) in State court. (ECF 1). While interference with access to the courts claims commonly involve a-case-within-a-case scenario, Mayberry's claim has a third layer due to the allegations that the Wabash Valley Correctional Facility librarian's tortious conduct impeded Mayberry's ability to obtain relief in a family-related proceeding in State court. (ECF 85 at 10-11, 35). The parties filed cross-motions for summary judgment, which remain pending. (ECF 52, 89). Relatedly, the Court will grant the motion for leave to file a sur-reply (ECF 102) and deems the sur-reply (ECF 102-1) filed for the purposes of this Opinion and Order.

A.  FACTS

At his deposition, Mayberry testified that he resided at the Wabash Valley Correctional Facility on May 26, 2021. (ECF 85 at 10). His friend[1] had hired an attorney to draft a motion and

---

[1] At his deposition, Mayberry referred to this individual as both a friend and a brother but clarified that this individual was a close friend that he considered a brother. (ECF 85 at 13). For purposes of this Order, the Court will refer to this individual as Mayberry's friend.

had mailed a copy of the motion to Mayberry for him to file in a State court proceeding "related to [his] children[.]" (*Id.* at 10-11, 35). He went to the law library to make another copy of the motion for his own records and to mail it to the State court. (*Id.* at 11-12). He gave the copy of the motion to the library supervisor to make another copy. (*Id.* at 11-13). However, when he asked her for the copies, she responded that she had instead shredded the copy he gave her. (*Id.* at 15-16). When he asked her why she had shredded it, she ordered him to leave her office. (*Id.* at 20). Mayberry declined to leave immediately and accused her of wrongdoing until correctional staff forced him to leave. (*Id.* at 22).

At his deposition, Mayberry explained[2] his reluctance to ask his friend for another copy of the motion as follows:

> **Defense Counsel:** Did you every speak with your [friend] about what happened?
>
> **Mayberry:** No.
>
> **Defense Counsel:** Okay. And why not?
>
> **Mayberry:** The only way I could speak to him was over the phone, and Wabash is . . . a racist environment, and I didn't want to jeopardize or say anything over the phone that would jeopardize my life or safety . . . .
>
> **Defense Counsel:** [Y]ou got this document from your [friend] . . . . prior to May 26[], 2021; right?
>
> **Mayberry:** Yes.
>
> **Defense Counsel:** And did you request that from him over the phone initially?
>
> **Mayberry:** Yes . . . .
>
> **Defense Counsel:** [W]hy didn't you ask him for another copy of it afterwards?
>
> **Mayberry:** Because prior to May 26th, there was no altercation with it being or anything like that. After . . . May 26th, if I were to ask my [friend], he would of course ask me what happened to the other one.

---

[2] For the purposes of the Court's recitation of Mayberry's deposition in this Opinion and Order, the Question lines are referenced as "Defense Counsel" and the Answer lines are referenced as "Mayberry". (ECF 85).

**Defense Counsel:** And you didn't want to tell him it was destroyed?

**Mayberry:** No. I just explained the environment there is dangerous.

**Defense Counsel:** Yeah, I guess I need a little bit more context of what you mean by that. Why don't you explain, what did you fear?

**Mayberry:** I feared the police or whoever was listening to the phone calls. The phone calls are recorded. That they would hear me speaking about a matter where a prison official had destroyed something or did something they weren't allowed to do or he sensed my anger or aggression about the matter and possibly retaliate against me.

**Defense Counsel:** The document that this unknown woman destroyed, was it something that you weren't supposed to have?

**Mayberry:** No, it was not.

**Defense Counsel:** It was something that you could have?

**Mayberry:** Yes, it was something I could have.

**Defense Counsel:** So then, again, what's the concern? If it's a document that you are allowed to have - -

**Mayberry:** No, it's not - -

**Defense Counsel:** - - why couldn't you get another copy?

**Mayberry:** It's not the document. It's the fact that the first document was destroyed. So when I tell my [friend], hey, I need you to send me another motion, to have the lawyer send another motion, and he says, what happened to the first one? and I say, the law library supervisor destroyed it, and then he goes into a further inquiry on why was it destroyed, and we have that whole conversation that would give rise to retaliation because the phone calls are recorded. That's the problem.
    It has nothing to do with the original document being illegal or I'm not supposed to have it. What I'm saying is, once I explain it to my [friend], what happened to the document and that IDOC staff arbitrarily destroyed it, either by that conversation or by him following up or calling IDOC, because my [friend] is litigious as well, that could put me in physical harm.

**Defense Counsel:** Physical harm from who?

**Mayberry:** The correctional staff at Wabash Valley Correctional Facility.

**Defense Counsel:** So your fear was that if you reported to your [friend] that this document was destroyed and that you need another one, even though you were

3

allowed to have this document, you were afraid that the correctional officers would physically harm you?

**Mayberry:** Not for me getting the document, but for me reporting that a correctional officer or the law library supervisor had destroyed it arbitrarily.

(*Id*. at 22-25).

* * *

**Defense Counsel:** So if something happened to you in prison, anything happened to you, that you were not okay with, that you didn't like, you would not report it for fear of retaliation?

**Mayberry:** Unless I was dying and needed immediate assistance, no, I would not report it.

(*Id*. at 26-27).

* * *

**Defense Counsel:** I'm just trying to get to the basis of this sort of thought process that you can't report things to prison staff. Is there anything that happened at Wabash that led you to sort of form this thought process?

**Mayberry:** Yes.

**Defense Counsel:** Okay. What happened?

**Mayberry:** Not only did I personally witness staff beating, spraying, terrorizing and torturing prisoners, but the staff members told me that things operate a little differently at Wabash and for me to tread lightly.

**Defense Counsel:** So you were told by staff not to report things, is that what you're saying?

**Mayberry:** That's what I took, for me to tread lightly, because when I was implying that I was going to file a lawsuit against the person that destroyed paperwork, the officer told me to tread lightly, like things are a little different down there, especially when you look like me.

**Defense Counsel:** So this happened in May 2021 that you were told this; right?

**Mayberry:** Yes. The officer that escorted me from the law library told me this.

**Defense Counsel:** I see. Okay. So . . . for the . . . 14, 15 months you were at Wabash before this, did anything occur that made you think, oh man, I better not report anything if anything happens to me?

4

> **Mayberry:** Yes. I seen assaults by staff on prisoners. I was . . . in G the entire time that I was at Wabash. There's . . . . a hallway that doesn't have cameras. I've personally witnessed police taking prisoners one at a time into that hallway and beat them while they're handcuffed and then bring them back to the unit. I've personally seen it with my own two eyes, and that was as a result of prisoners telling or prisoners doing certain things that the officers didn't like.

(*Id.* at 28-29 (quotation marks added)).

Mayberry was told by his friend that he had paid the attorney $200 to prepare the motion. (*Id.* at 34-35). Mayberry did not miss any court deadlines due to the library supervisor shredding his copy of the motion. (ECF 86 at 23-24). He also did not file a notice of tort claim against the library supervisor about the May 2021 incident while at Wabash Valley Correctional Facility due to his fear of retaliation. (ECF 85 at 53). However, in March 2021, Mayberry submitted a grievance "about the mail," and in August and September 2021, Mayberry submitted grievances regarding a different library supervisor, Jacqueline Gilbert. (ECF 86 at 6).

On October 14, 2021, Mayberry transferred to the Miami Correctional Facility. (ECF 85 at 8). He attests that "[b]ecause [he] was no longer being held prisoner at WVCF, the immediate fear of threat, intimidation, and retaliation by WVCF staff was no longer a clear and present danger to [him]." (ECF 54 at 1). On October 17, he asked for a notice of tort claim form from the law library, indicating that he had a filing deadline of November 22 under the ITCA. (ECF 85 at 56-57, 70; ECF 86 at 1). On October 28, he followed up with Stacy Hall, who told him "she would get to it[.]" (ECF 86 at 20; *see id*. at 10, 19-20). On November 10, he asked Stacy Hall in person for a notice of tort claim form, but she declined to immediately provide one. (ECF 85 at 61-64). On November 18, he received the form and completed it, and he placed it in the intra-facility mail to the law library for copies, which he needed to comply with the ITCA service requirements. (*Id.* at 64-68). He did not receive the copies until December 13 and never filed the notice of tort claim form. (*Id.* at 69).

5

The unsubmitted notice of tort claim form reads as follows:

> On May 26, 2021, while attending the law library at Wabash Valley Correctional Facility[,] my legal work (property) was arbitrarily destroyed without cause and I was not reimbursed for its preparation of given just cause. There was a woman unknown to me working this day. The value of my legal work in preparation and work hours I value at least $200 dollars but potential for relief the legal work could have brought I value in the thousands. I felt intimidated at W.V.C.F. so I was afraid to file this tort, but since then I have moved and am pursuing this tort within the statutory time in a safe environment where W.V.C.F. staff cannot retaliate.

(ECF 1-1 at 12).

Angela Heishman, Litigation Liaison at the Miami Correctional Facility, attested that according to facility records on November 10, 2021, Mayberry submitted a notice of tort claim on a different matter. (ECF 88-1 ¶¶ 1, 14). Facility records also contain no indication that Mayberry submitted a request for a notice of tort claim form on October 17, 2021. (*Id.* ¶ 11).

At his deposition, Mayberry referenced a lawsuit that he had filed against another librarian at the Wabash Valley Correctional Facility, which the Court has identified as *Mayberry v. Gilbert*, 1:21-cv-03031-TWP-TAB, 2023 WL 34686, at *1 (S.D. Ind., *dismissed*, 2023) ("Case No. 1:21-cv-03031"). (ECF 85 at 52-53). The factual allegations of that lawsuit pertain to Librarian Gilbert and her refusal to copy his legal documents at the Wabash Valley Correctional Facility. *See Mayberry*, 2023 WL 34686, at *1. According to the complaint, from August 4 through October 6, 2021, Mayberry submitted and appealed three grievances regarding Librarian Gilbert, wrote to the warden four times, and wrote to the deputy warden once. (No. 1:21-cv-03031, ECF 2 ¶¶ 11-61). He attested that he felt threatened by Librarian Gilbert, whose behavior toward him had caused him to be "afraid for [his] life and safety[,]" (No. 1:21-cv-03031, ECF 2 ¶ 42), and that he was "targeted and terrorized" (No. 1:21-cv-03031, ECF 2 ¶ 83), for accessing the courts and complaining about Librarian Gilbert. Following a particularly hostile interaction with Librarian Gilbert on September 8, 2021, he immediately submitted a grievance and a notice of tort claim regarding her behavior. (No. 1:21-cv-03031, ECF 2 ¶¶ 40-47). In that complaint,

6

Mayberry also characterized his transfer to the Miami Correctional Facility as retaliation for his complaints about Librarian Gilbert. (No. 1:21-cv-03031, ECF 2 ¶¶ 69-70).

## STANDARD OF REVIEW

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* In determining whether summary judgment is appropriate, the deciding court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *See Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010).

## DISCUSSION

In the cross-motions the parties assert various arguments that they are entitled to summary judgment. However, the Court will primarily focus on the issue as to whether the claim regarding the May 2021 incident was a potentially meritorious legal claim. Mayberry cites *Wheeler v. State*, 180 N.E.3d 305 (Ind. Ct. App. 2021), to show that his claim regarding the May 2021 incident was potentially meritorious. (ECF 96 at 3). According to *Wheeler*, "[a] plaintiff seeking damages for negligence must establish (1) a duty owed to the plaintiff by the defendant, (2) a breach of the duty, and (3) an injury proximately caused by the breach of duty." *Wheeler*, 180 N.E.3d at 309 (citation omitted).

Prisoners are entitled to meaningful access to the courts. *See Bounds v. Smith*, 430 U.S. 817, 824 (1977). "The right of access to the courts is the right of an individual, whether free or

7

incarcerated, to obtain access to the courts without undue interference." *Snyder v. Nolen*, 380 F.3d 279, 291 (7th Cir. 2004). "The right of individuals to pursue legal redress for claims that have a reasonable basis in law or fact is protected by the First Amendment right to petition and the Fourteenth Amendment right to substantive due process." *Id*. (citations omitted). Denial of access to the courts must be intentional; "simple negligence will not support a claim that an official has denied an individual of access to the courts." *Id*. at 291 n.11 (citing *Kincaid v. Vail*, 969 F.2d 594, 602 (7th Cir. 1992); *Lee X v. Casey*, 771 F. Supp. 725, 729 (E.D. Va. 1991)).

To establish a violation of the right to access the courts, an inmate must show that unjustified acts or conditions (by defendants acting under color of law) "hindered [the inmate's] efforts to pursue a [non-frivolous] legal claim[,]" *Nance v. Vieregge*, 147 F.3d 589, 590 (7th Cir. 1998) (citation omitted), and that actual injury (or harm) resulted, *see Lewis v. Casey*, 518 U.S. 343, 351 (1996) (holding that *Bounds* did not eliminate the actual injury requirement as a constitutional prerequisite to a prisoner asserting lack of access to the courts); *see also* Pattern Civil Jury Instructions of the Seventh Circuit, 8.02 (rev. 2017) (discussing the denial of a prisoner's access to court). In other words, "the mere denial of access to a prison law library or to other legal materials is not itself a violation of a prisoner's rights; his right is to access *the courts*," and only if the defendants' conduct prejudices a potentially meritorious legal claim has the right been infringed. *Marshall v. Knight*, 445 F.3d 965, 968 (7th Cir. 2006) (citation and footnote omitted).

To start, the Court observes a disconnect between the alleged loss of property and the damages sought in the tort claim. Specifically, Mayberry sought $200 for the value of legal services. However, the record indicates that the unidentified librarian merely destroyed one copy of the motion that resulted from the legal work, and the record contemplates the existence of the original motion and other copies in the possession of his friend and the attorney. Consequently,

the shredding of a copy, by itself, could not have deprived Mayberry of the value or the benefit of the legal services.

Further, Mayberry could have obtained another copy from these individuals in a myriad of ways even crediting his fear of physical retaliation.[3] Notably, under Indiana law, tort plaintiffs have a "duty to mitigate . . . post-injury damages . . . ." *Buhring v. Tavoletti*, 905 N.E.2d 1059, 1064 (Ind. Ct. App. 2009) (citation omitted); *see Becker v. Fisher*, 852 N.E.2d 46, 49 (Ind. Ct. App. 2006). For example, Mayberry likely could have found a way to ask his friend for another copy without mentioning how he lost the first copy. He could have asked his friend for another copy in a more forthcoming manner following his transfer to the Miami Correctional Facility given that he no longer feared retaliation at that time. He could have directly contacted the attorney to ask for another copy or for the attorney to file the motion with the State court on his behalf. He also could have prepared a substantially equivalent motion from memory using his access to the law library.

Next, in the unsubmitted notice of tort claim, Mayberry sought thousands of dollars to compensate for the legal relief he was unable to seek due to his purported inability to file the motion. (ECF 1-1 at 12). However, during his deposition, Mayberry pointedly refused to provide a detailed description of the contents of the motion or the State court proceeding in which he sought to file it.[4] The lack of a detailed description of the motion or the related State court

---

[3] While Mayberry's purported fear of retaliation is credited for purposes of this motion, the Court questions whether a reasonable jury could do so given Mayberry's barrage of complaints about Librarian Gilbert to the grievance office, the deputy warden, the warden, and the tort claims administrator just three months later when he was still at the Wabash Valley Correctional Facility.

[4] Specifically, the transcript of Mayberry's deposition reads as follows:

> **Defense Counsel:** What document was it that she shredded? You said it was a form, but what was this form requesting?
>
> **Mayberry:** It wasn't a form. It was a drafted motion. It's a private matter that I'm not going to disclose.

proceeding makes it impossible to meaningfully assess the library supervisor's conduct, the fair market value of the legal services, or whether Mayberry suffered any harm as a result of his purported inability to file the motion. Though Mayberry contends that the merit of his potential claim against the library supervisor is undisputed, the Court instead finds that the record lacks sufficient evidence for a reasonable jury to conclude that the claim was potentially meritorious. Indeed, it does not appear that the asserted injuries have any evidentiary support; even the evidence of the $200 payment is supported only by hearsay from an unidentified friend. *See Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997) ("And hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial, except that affidavits and depositions, which (especially affidavits) are not generally admissible at trial, are admissible in summary judgment proceedings to establish the truth of what is attested or deposed, provided, of course, that the affiant's or deponent's testimony would be admissible if he were testifying live."(internal citations omitted)); Fed. R. Evid. 801(c) (defining hearsay); Fed. R. Evid. 802 (rule against hearsay); *see also Gunville v. Walker*, 583 F.3d 979, 985-86 (7th Cir. 2009) (declining to consider hearsay at the summary judgment stage); *Logan v. Caterpillar, Inc.*, 246 F.3d 912, 925 (7th Cir. 2001) ("Logan's claim that the State's Attorney told him that she was dismissing the charges because she was concerned that she would not be able to obtain a conviction is hearsay, and it is thus not enough to preclude summary judgment on this issue." (citation omitted)); *Winskunas v. Birnbaum*, 23 F.3d 1264, 1268 (7th Cir. 1994) ("Even if he was identified, that someone's out of court declaration to Winskunas is pure hearsay, admissible under none of the myriad exceptions to the hearsay rule and therefore incapable of creating a *genuine* issue of material fact . . . ." (citations omitted)). Given that the library supervisor destroyed only a copy of the motion, that Mayberry had the opportunity to mitigate any harm

---

(ECF 85 at 20).

resulting from the shredded copy, and the lack of detail regarding the motion and related State court proceeding, no reasonable jury could find that the claim against the library supervisor was potentially meritorious on this record.

Additionally, Mayberry contends that the details provided in the unsubmitted notice of tort claim were sufficient to satisfy the notice requirements of the ITCA, citing *Collier v. Prater*, 544 N.E.2d 497, 499 (Ind. 1989). (ECF 102-1 at 1). That may be, but an interference with access to the courts requires Mayberry to demonstrate the existence of a potentially meritorious claim, not merely a procedurally compliant claim. Stated otherwise, the procedural question of whether an administrative filing contains sufficient detail to satisfy an exhaustion requirement is entirely separate from the substantive question of whether a claim has merit. *See e.g., Strong v. David*, 297 F.3d 646, 650 (7th Cir. 2002) ("When the administrative rulebook is silent, a grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought."); *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994) ("The test for determining whether an EEOC charge encompasses the claims in a complaint therefore grants the Title VII plaintiff significant leeway: all Title VII claims set forth in a complaint are cognizable that are like or reasonably related to the allegations of the charge and growing out of such allegations." (citations and quotation marks omitted)).

Moreover, Mayberry never submitted the tort claim to the claims administrator or the State courts, precluding a reasonable jury from finding that Stacy Hall hindered his efforts to pursue a claim regarding the May 2021 incident by rendering it untimely. *See In re Maxy*, 674 F.3d 658, 661 (7th Cir. 2012) ("Relief for the denial of access to the courts is intended to remedy rights *denied in a separate case due to the impediment* . . . ." (emphasis added)). Had Mayberry pursued such a claim in State court and explained the reasons for his delayed notice of the claim, the State defendants might have declined to assert untimeliness, or the State courts might have

excused it under equitable principles. *See Blackford v. Welborn Clinic*, 172 N.E.3d 1219, 1224 (Ind. 2021) ("Principles of equity preclude a party from invoking the statute of limitations as a defense when that party, by fraud or other misconduct, has prevented the filing of a lawsuit or induced its delay beyond the time permitted by statute." (citation and quotation marks omitted)); *see also City of Columbus v. Londeree*, 145 N.E.3d 827, 833 (Ind. Ct. App. 2020) (applying equitable doctrines to timeliness of an ITCA claim); *City of Evansville v. Magenheimer*, 37 N.E.3d 965, 968 (Ind. Ct. App. 2015) ("[W]hen a plaintiff fails to give the required notice under the ITCA, the defendant has an affirmative defense which must be raised in a responsive pleading to the plaintiff's complaint." (citation, emphasis and quotation marks omitted)). Alternatively, the State court might have opted to dispose of the claim on the merits instead of, or in addition to, procedural grounds as a matter of judicial economy. *See e.g., Hopkins v. State*, 782 N.E.2d 988, 990-91 (Ind. 2003) ("We agree with the Court of Appeals that the law of the case doctrine bars Defendant's claim. Given our familiarity with the facts of this case, we nonetheless proceed to the merits in the interest of judicial economy . . . ."); *Price v. State*, 619 N.E.2d 582, 583 (Ind. 1993) ("The State is correct that this was in violation of Ind. Appellate Rule 2(A), which requires a praecipe to be filed within thirty days after entry of final judgment. However, in the interest of judicial economy, we will treat this as a belated appeal and decide this case on its merits.").

In sum, the Court finds that the record lacks sufficient evidence for a reasonable jury to conclude that Mayberry's claim regarding the May 2021 incident was potentially meritorious.[5] It

---

[5] Mayberry filed a motion for leave to file additional authorities on June 23, 2025. (ECF 107). However, the Court will deny this motion because "plaintiff does not provide any justification for the delay in seeking to file an additional brief. Had plaintiff wanted to present additional legal authorities . . . but his incarceration prevented him from conducting the necessary research, he could have filed a motion seeking additional time . . . ." *Swift v. City of Milwaukee*, No. 07-C-857, 2009 WL 188012, at *7 (E.D.Wis.,2009). Moreover, "defendant[] [is] entitled to summary judgment because plaintiff has failed to submit any admissible evidence raising a genuine issue of material fact." *Id*.

12

follows that a reasonable jury also could not find that Stacy Hall hindered Mayberry's pursuit of a potentially meritorious claim. Further, given that Mayberry never filed the claim in State court, it is impossible to discern whether the State court would have dismissed it solely on the basis of untimeliness. As a result, no reasonable jury could conclude that Stacy Hall's delay in providing Mayberry with copies prevented him from pursuing a claim regarding the May 2021 incident in State court by rendering it untimely. Consequently, Stacy Hall's motion for summary judgment will be granted, and Mayberry's motion for summary judgment will be denied.

For these reasons, the Court:

(1) GRANTS the motion for leave to file a sur-reply (ECF 102), and deems the sur-reply (ECF 102-1) filed;

(2) DENIES the motion for summary judgment filed by Plaintiff Timothy Marcus Mayberry (ECF 52);

(3) GRANTS the motion for summary judgment filed by Defendant Stacy Hall (ECF 89);

(4) DENIES Plaintiff Timothy Marcus Mayberry's motion to file additional authorities (ECF 107); and

(5) DIRECTS the Clerk to enter judgment in favor of Defendant Stacy Hall and to close this case.

SO ORDERED.

Entered this 30th day of June 2025.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge